Anne L. Weismann
D.C. Bar No. 298190
Melanie Sloan
D.C. Bar No. 454584
Kimberly D. Perkins
D.C. Bar No. 481460
Citizens for Responsibility
and Ethics in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20005
202-408-5565

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON 1400 Eye Street, N.W., Suite 450 Washington, D.C.  20005 | : : : : | |
| Plaintiff, | : : | |
| v. | : : | Civil Action No. |
| OFFICE OF MANAGEMENT AND BUDGET 725 17TH Street, N.W. Washington, D.C. 20503 | : : : : | |
| Defendant. | : : | |

## COMPLAINT FOR
## DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

1. This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. §552, as

amended, as well as agency FOIA regulations, challenging the failure of the Office of

Management and Budget ("OMB") to fulfill the request of Plaintiff for documents relating to

federally funded pregnancy resource centers.

2.  This case seeks declaratory relief that Defendant is in violation of the FOIA and OMB regulations 5 C.F.R. Part 1303, for failing to fulfill Plaintiff's request for records, and injunctive relief that Defendant immediately and fully comply with Plaintiff's request under the FOIA.

## JURISDICTION AND VENUE

3.  This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. §552(a)(4)(B).  This Court also has jurisdiction over this action pursuant to 28 U.S.C. §1331.  Venue lies in this district under 5 U.S.C. §552(a)(4)(B).

4.  Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") is a non-profit corporation, organized under section 501(c)(3) of the Internal Revenue code.  CREW is committed to protecting the right of citizens to be informed about the activities of government officials and to ensuring the integrity of government officials.  CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the government decision-making process.  To advance its mission, CREW uses a combination of research, litigation, advocacy and public education.  As part of its research CREW uses government records made available to it under the FOIA.

5.  CREW has invested considerable organizational resources in pushing the U.S. government to take ethics issues seriously.  CREW monitors closely the laws and rules applicable to government agencies.

6.  CREW is harmed by OMB's failure to comply with the FOIA, because that failure harms CREW's ability to provide full, accurate and current information to the public on a matter

2

of great public interest and urgency. 5 U.S.C. §552(a)(6)(c). Absent this critical information, CREW cannot advance its mission of educating the public to ensure that the public continues to have a vital voice in government decisions.

7. CREW will analyze the information it receives that is responsive to its request and will share it with the public through memoranda, reports, or press releases. In addition, CREW will disseminate any documents it acquires from its request to the public through its website, www.citizensforethics.org. Currently, the CREW website contains links to thousands of pages of documents acquired from multiple FOIA requests. See http://citizensforethics.org/activities/foia.php. Visitors to CREW's website can peruse the FOIA request letters, the responses from government agencies and a growing number of documents responding to FOIA requests. CREW's virtual reading room provides around-the-clock access to anyone willing to learn about the government activities that were the focus of CREW's FOIA requests. The CREW website also includes documents relating to CREW's FOIA litigation, Internal Revenue Service complaints and Federal Election Commission complaints.

8. Defendant OMB is an agency within the meaning of 5 U.S.C. §552(f). Defendant is the federal agency with possession and control of the requested records and is responsible for fulfilling Plaintiff's FOIA request.

## STATUTORY FRAMEWORK

### The Freedom of Information Act

9. The FOIA, 5 U.S.C. §552, requires agencies of the federal government to release requested records to the public unless one or more specific statutory exemptions apply.

3

10.  An agency must respond to a party making a FOIA request within 20 working days, notifying that party of at least the agency's determination whether or not to fulfill the request and of the requester's right to appeal the agency's determination to the agency head.  5 U.S.C. §552(a)(6)(A)(i).

11.  An agency must respond to a FOIA appeal within 20 working days, notifying the appealing party of the agency's determination to either release the withheld records or uphold the denial.  5 U.S.C. §552(a)(6)(A)(ii).

12.  In "unusual circumstances," an agency may delay its response to a FOIA request or appeal, but must provide notice and must also provide "the date on which a determination is expected to be dispatched."  5 U.S.C. §552(a)(6)(B).

13.  This Court has jurisdiction, upon receipt of a complaint, "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant."  5 U.S.C. §552(a)(4)(B).

14.  The FOIA provides a mechanism for disciplinary action against agency officials who have acted inappropriately in withholding records.  Specifically, when requiring the release of improperly withheld records, if the Court makes a written finding that "the circumstances surrounding the withholding raise questions whether agency personnel acted arbitrarily or capriciously," a disciplinary investigation is triggered.  5 U.S.C. §552(a)(4)(F).

**FACTS GIVING RISE TO PLAINTIFF'S CLAIMS FOR RELIEF**

15.  In July 2006, Representative Henry A. Waxman released a report based on his request of the U.S. House of Representatives' Special Investigations Division to conduct an investigation into whether the information provided by federally funded pregnancy resource centers to pregnant

4

women and teens is scientifically accurate. <u>See</u> United States House of Representatives, Committee on Government Reform - Minority Staff, Special Investigations Division, "False and Misleading Health Information Provided by Federally Funded Pregnancy Resource Centers" (July 2006) (online at: http://reform.democrats.house.gov/Documents/20060717101140-30092.pdf)("House Report")(attached as Exhibit A).

16. According to the report, pregnancy resource centers were created in 2002 and are a component of the Bush Administration's faith-based initiative program. <u>See</u> House Report at 2.

17. In exchange for their receipt of more than $30 million in federal funding, pregnancy resource centers provide counseling to pregnant teenagers and women. Additionally, 25 pregnancy resource centers in 15 states receive additional funding through grants from a new $150 million "capacity-building" Compassion Capital Fund, a component of the administration's budget that is prepared, supervised and overseen by OMB, and managed by the Department of Health and Human Services. <u>Id</u>. at 3-4.

18. For purposes of this report, female investigators focused on the 25 pregnancy resource centers that have received grants from the Compassion Capital Fund. Posing as pregnant 17-year-olds trying to have an abortion, the investigators successfully telephoned 23 of the 25 centers and requested information and advice regarding unintended pregnancy. <u>Id</u>. at i.

19. Of the 23 pregnancy resource centers that were successfully contacted, 20 provided false or misleading information about the health effects of abortion. Some of them also misrepresented the medical risks of abortion, informing callers that abortion could increase their risks of breast cancer, sterility and suicide. <u>Id</u>.

20.  Finally, the report found that the false information provided by the pregnancy resource centers "may advance the mission of the pregnancy resource centers, which are typically pro-life organizations dedicated to preventing abortion, but it is an inappropriate public health practice." Id. at ii.

21.  On July 18, 2006, *The Washington Post* reported that a spokeswoman for one of the two large networks of pregnancy resource centers, Care Net's Molly Ford, stated that despite mainstream medical opinion, she agrees with the pregnancy resource center counselors who tell women that abortion may increase the risk of breast cancer, infertility and post-abortion syndrome.  Mark Kaufman, Pregnancy Centers Found to Give False Information on Abortion, *The Washington Post*, July 18, 2006 (attached as Exhibit B).

22.  Additionally, the article stated that prior to 2001, few of the pregnancy resource centers received any federal funding, but since President Bush has been an advocate for pregnancy resource centers and abstinence-only sex education, there are now about 2000 centers in the United States and Canada that receive federal funding. Id.

23.  OMB continues to budget millions of dollars for the Compassion Capital Fund to advance the efforts of community-based charitable organizations and publicly urges the Congress to adequately fund the President's request for the Compassion Capital Fund.  Moreover, part of OMB's mission is to supervise the administration of the budget in executive branch agencies, evaluate the effectiveness of agency programs, policies, and procedures, and ensure that agency reports, rules, testimony and proposed legislation are consistent with the President's budget and

Administration policies. See http://whitehouse.gov/omb/organization/role.html (attached as Exhibit C).

**Plaintiff's FOIA Request and Follow-Up**

24.  By letter dated August 4, 2006, pursuant to the Freedom of Information Act, Plaintiff requested that OMB produce all records that mention or relate to the following: federally funded pregnancy resource centers; communications with the White House or any federal, state, and local government agencies regarding pregnancy resource centers; faith-based and community initiatives as they relate to pregnancy resource centers; and the federal funding of pregnancy resource centers.  See Letter from Sharon Y. Eubanks to Freedom of Information Officer, Office of Management Budget, August 4, 2006 (attached as Exhibit D).

25.  CREW also requested a waiver of fees associated with processing its request, pursuant to 5 U.S.C. §552(a)(4)(A)(iii).  Id.  CREW explained that the subject of its request concerns "the operations of the federal government," that "the disclosures will likely contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way," and that CREW is making the request "primarily and fundamentally for non-commercial purposes."  Id.  More specifically, CREW explained that the records it is seeking "are likely to contribute to the public's understanding of the how the government uses taxpayer dollars in its grant-awarding process."  Id.

26.  On September 22, 2005, OMB responded to CREW's FOIA request by stating that it had identified four documents that "are potentially responsive to your [CREW's] request. . . however, these four documents are exempt from mandatory disclosure pursuant to FOIA

Exemption, 5 U.S.C. § 552(b)(5).  See Letter from Lauren E. Wright to Sharon Y. Eubanks,

September 22, 2006 (attached as Exhibit E).

27.  On September 27, 2006, CREW appealed OMB's initial determination that only four

documents were responsive to its request, and that those documents constitute inter-agency or

intra-agency predecisional deliberative communications that are exempt from disclosure pursuant

to FOIA Exemption 5.  See Letter from Kimberly D. Perkins to Lauren E. Wright, September 27,

2006 (attached as Exhibit F).

28.  On November 9, 2006, OMB responded to CREW's September 27, 2006 appeal.  In

its response, OMB confirmed the adequacy of its search, which yielded only four responsive

documents, and affirmed its decision to withhold those documents as intra-agency, inter-agency,

pre-decisional and deliberative communications based on Exemption 5 of FOIA.  See Letter from

Kimberley Luczynski to Kimberly D. Perkins, November 9, 2006 (attached as Exhibit G).

29.  Other than the aforementioned September 22 and November 9, 2006 correspondence

from OMB, CREW has received no other response from OMB.

30.  CREW has now exhausted its administrative remedies with respect to the processing

of CREW's FOIA request.  See, e.g., Oglesby v. U.S. Dep't of Army, 920 F.2d 57, 65 (D.C. Cir.

1990).

## PLAINTIFF'S CLAIMS FOR RELIEF

## CLAIM ONE
### (Failure to Produce Records)

31.  Plaintiff realleges and incorporates by reference all preceding paragraphs.

32.  Plaintiff properly asked for records within OMB's control.

33.  Plaintiff is entitled by law to access to the records requested under the FOIA, unless Defendant makes an explicit and justified statutory exemption claim.

34.  Therefore, Defendant violated FOIA's mandate to release agency records to the public by failing to release the records as Plaintiff specifically requested.  5 U.S.C. §§552(a)(3)(A), 552(a)(4)(B).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(1) Declare that OMB has violated the Freedom of Information Act by failing to lawfully satisfy Plaintiff's FOIA request of August 4, 2006;

(2) Award Plaintiff its reasonable attorney fees and litigation costs in this action, pursuant to 5 U.S.C. §552(a)(4)(E); and

(3) Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Anne L. Weismann
(D.C. Bar No. 298190)
Kimberly D. Perkins
(D.C. Bar No. 481460)
Melanie Sloan
(D.C. Bar No. 454584)
Citizens for Responsibility and
  Ethics in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20005
Phone: (202) 408-5565
Fax: (202) 588-5020
Attorneys for Plaintiff

Dated: January 4, 2007

**EXHIBIT A**



UNITED STATES HOUSE OF REPRESENTATIVES
COMMITTEE ON GOVERNMENT REFORM — MINORITY STAFF
SPECIAL INVESTIGATIONS DIVISION
JULY 2006

# FALSE AND MISLEADING HEALTH INFORMATION PROVIDED BY FEDERALLY FUNDED PREGNANCY RESOURCE CENTERS

PREPARED FOR
REP. HENRY A. WAXMAN

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ...........................................i

I.    BACKGROUND...................................... 1

  A.  Pregnancy Resource Centers................................1

  B.  Federal Funding of Pregnancy Resource Centers...............2

II.   PURPOSE AND METHODOLOGY.................. 6

III.  FINDINGS ............................................. 7

  A.  Pregnancy Resource Centers Provided False and Misleading
      Information About Abortion and Breast Cancer.................7

  B.  Pregnancy Resource Centers Provided False and Misleading
      Information About the Effect of Abortion on Future Fertility.................9

  C.  Pregnancy Resource Centers Provided False and Misleading
      Information About the Mental Health Effects of Abortion .................11

CONCLUSION .................................... 14

# EXECUTIVE SUMMARY

In December 2004, Rep. Henry A. Waxman released a report analyzing the scientific accuracy of the curricula taught by federally funded abstinence-only education programs. That report found that the abstinence curricula often contained false or distorted information that misled teens about sex and reproductive health.

At the request of Rep. Waxman, this report examines the scientific accuracy of the information provided by another Bush Administration priority: federally funded "pregnancy resource centers." These organizations, which are also called "crisis pregnancy centers," provide counseling to pregnant teenagers and women. Since 2001, pregnancy resource centers have received over $30 million in federal funding. Most of this money has come from federal programs for abstinence-only education. Additional funding has been distributed as "capacity-building" grants to 25 pregnancy resource centers in 15 states as part of the new $150 million Compassion Capital Fund. Individual centers have also been the beneficiaries of earmarks in appropriations bills.

For this report, female investigators telephoned the 25 pregnancy resource centers that have received grants from the Compassion Capital Fund, requesting information and advice regarding an unintended pregnancy. Twenty-three of the centers were successfully contacted. In each call, the investigator posed as a pregnant 17-year-old trying to decide whether to have an abortion.

During the investigation, 20 of the 23 centers (87%) provided false or misleading information about the health effects of abortion. Often these federally funded centers grossly misrepresented the medical risks of abortion, telling the callers that having an abortion could increase the risk of breast cancer, result in sterility, and lead to suicide and "post-abortion stress disorder."

Specifically, the report finds:

- **The centers provided false and misleading information about a link between abortion and breast cancer.** There is a medical consensus that induced abortion does not cause an increased risk of breast cancer. Despite this consensus, eight centers told the caller that having an abortion would in fact increase her risk. One center said that "all abortion causes an increased risk of breast cancer in later years." Another claimed that research shows a "far greater risk" of breast cancer after an abortion, telling the caller that an abortion would "affect the milk developing in her breasts" and that the risk of breast cancer increased by as much as 80% following an abortion.

- **The centers provided false and misleading information about the effect of abortion on future fertility.** Abortions in the first trimester, using the most common abortion procedure, do not pose an increased risk for future fertility. However, seven centers told the caller that having an abortion could hurt her chances of having children in the future. One center said that damage from abortion could lead to "many miscarriages" or to "permanent damage" so "you wouldn't be able to carry," telling the caller that this is "common" and happens "a lot." Another center said, "In the future you could have trouble conceiving another baby" because of scar tissue, a side effect of abortion that happens to "a lot of women."

- **The centers provided false and misleading information about the mental health effects of abortion.** Research shows that significant

psychological stress after an abortion is no more common than after birth. However, thirteen centers told the caller that the psychological effects of abortion are severe, long-lasting, and common. One center said that the suicide rate in the year after an abortion "goes up by seven times." Another center said that post-abortion stress suffered by women having abortions is "much like" that seen in soldiers returning from Vietnam and "is something that anyone who's had an abortion is sure to suffer from." Other centers said that abortion can cause "guilt, … sexual problems, … suicidal ideas, … drug use, eating disorders," and "a downward spiral where they lose friends and family members."

The individuals who contact federally funded pregnancy resource centers are often vulnerable teenagers, who are susceptible to being misled and need medically accurate information to help them make a fully informed decision. The vast majority of pregnancy resource centers contacted for this report, however, provided false or misleading information about the health risks of an abortion. This may advance the mission of the pregnancy resource centers, which are typically pro-life organizations dedicated to preventing abortion, but it is an inappropriate public health practice.

# I.    BACKGROUND

## A.    Pregnancy Resource Centers

"Pregnancy resource centers" are virtually always pro-life organizations whose goal is to persuade teenagers and women with unplanned pregnancies to choose motherhood or adoption.  They do not offer abortions or referrals to abortion providers.  In addition to initial counseling for pregnant teens and women, some centers may provide support services or referrals to prenatal care.

Many pregnancy resource centers, including all the centers contacted in this investigation, are affiliated with one or more national umbrella organizations.  Two such networks are Heartbeat International and Care Net.[1]  Heartbeat International describes itself as the "first pro-life network of pregnancy resource centers in the U.S. and the largest in the world, supporting, strengthening and starting nearly 1,000 pregnancy centers to provide alternatives to abortion."[2]  Care Net describes itself as "a Christian ministry assisting and promoting the evangelistic, pro-life work of pregnancy centers in North America."[3]

Many pregnancy resource centers used to describe themselves as "crisis pregnancy centers."  One organization explained the change in terminology as follows:  "God's truth never varies, but new methods of communicating it continue to emerge, including a departure from the term 'crisis pregnancy' itself.  Many centers now favor a more neutral, solution-oriented name, such as 'pregnancy resource center.'"[4]

Pregnancy resource centers often mask their pro-life mission in order to attract "abortion-vulnerable clients."[5]  This can take the form of advertising under "abortion services" in the yellow pages or obscuring the fact that the center does not provide referrals to abortions in the text of an advertisement.[6]   Some centers purchase advertising on internet

---

[1] Heartbeat International, *Worldwide Directory of Pregnancy Help* (online at www.heartbeatinternational.org/worldwide_directory.asp); Care Net, "Option Line" (online at www.care-net.org).

[2] Heartbeat International, *Pro-life Pregnancy Center Support* (online at: http://www.heartbeatinternational.org/).

[3] Care Net, *Our Mission* (online at: http://www.care-net.org/aboutus/mission.html).

[4] Focus on the Family, *What is a Pregnancy Resource Center?* (online at http://web.archive.org/web/20040616173837/www.family.org/pregnancy/articles/A0030278.cfm).

[5] *See* Kurt Entsminger, *Building a Successful Internet Advertising Campaign for Your Pregnancy Center* (2006) (online at http://www.care-net.org/publications/cof/internetadvertising.pdf).

[6] Deceptive advertising has been addressed in some court cases and state actions.  For example, in 2002, the New York Attorney General issued subpoenas to several centers across the state regarding misleading advertising; a subsequent consent decree with one center required it to adhere to certain standards of disclosure and practice.  Office of New York State Attorney General Eliot Spitzer, *Spitzer Reaches Agreement With Upstate Crisis Pregnancy Center* (Feb. 28, 2002) (online at www.oag.state.ny.us/press/2002/feb/feb28c_02.html).

search engines under keywords that include "abortion" or "abortion clinics."[7] Other advertisements represent that the center will provide pregnant teenagers and women with an understanding of all of their options. For example, "Option Line," a joint venture of Heartbeat International and Care Net, is a 24-hour telephone hotline that connects pregnant teenagers and women with pregnancy resource centers in their communities. The main page of Option Line's website states at the top, "Pregnant? Need Help? You Have Options," but does not reveal that both Heartbeat International and Care Net represent only pro-life centers or that only non-abortion options will be counseled.[8]

## B.    <u>Federal Funding of Pregnancy Resource Centers</u>

President Bush has declared that supporting pregnancy resource centers is a central component of his Administration's pro-life and faith-based agenda. In his acceptance speech at the 2000 Republican convention, Mr. Bush told the delegates:

> Big government is not the answer, but the alternative to bureaucracy is not indifference. It is to put conservative values and conservative ideas into the thick of the fight for justice and opportunity. This is what I mean by compassionate conservatism, and on this ground, we will lead our nation. ... In the next bold step of welfare reform, we will support the heroic work of homeless shelters and hospices, food pantry and crisis pregnancy centers, people reclaiming their communities block by block and heart by heart.[9]

The President has reiterated this theme in multiple speeches and proclamations:

- "My Administration encourages adoption and supports abstinence education, crisis pregnancy programs, parental notification laws, and other measures to help us continue to build a culture of life."[10]

- "A generous society values all human life .... and that is why my administration opposes partial-birth abortion and public funding for abortion; why we support teen abstinence and crisis pregnancy programs; adoption and parental notification laws; and why we are against all forms of human cloning."[11]

---

[7] Kurt Entsminger, *Building a Successful Internet Advertising Campaign for Your Pregnancy Center* (2006) (online at www.care-net.org/publications/cot/internetadvertising.pdf).

[8] Option Line (online at www.optionline.org).

[9] George W. Bush, *Remarks at the Republican National Convention* (Aug. 3, 2000).

[10] The White House, *A Proclamation: National Sanctity of Human Life Day* (Jan. 16, 2004) (online at http://www.whitehouse.gov/news/releases/2004/01/20040116-2.html).

[11] The White House, *President's Phone Call to March for Life Participants* (Jan. 22, 2002) (online at http://www.whitehouse.gov/news/releases/2002/01/20020122-10.html).

- "We will also continue our support for crisis pregnancy centers, incentives for adoption and parental notification laws. I propose to double federal funding for abstinence programs in schools and community-based programs."[12]

Prior to the Bush Administration, only a few pregnancy resource centers received federal funding. Beginning in 2001, however, federal funding of pregnancy resource centers increased sharply. In total, over $30 million in federal funds went to more than 50 pregnancy resource centers between 2001 through 2005.[13]

One major source of federal funds tapped by pregnancy resource centers is funding for abstinence-only education. Centers teach abstinence-until-marriage either on site or at other locations in the community, including public schools. At a 2005 conference, Care Net, the national umbrella organization, described the advantages of abstinence funding for pregnancy resource centers:

> [D]efending and promoting a culture of life is not just about saving babies of those women that walk into the center that are pregnant and thinking about abortion .... You're defending and promoting a culture of life through teaching them about their own sexuality, their own bodies, and in that, they begin to understand the creation process, and they begin to understand that an unborn child really is valuable. ...
>
> Now obviously when you go into public schools you can't start talking about Jesus dying on the cross, or you may not get invited back very quickly. But ... you're opening the door to a lot more people that may not normally know of your center, you're building credibility for your pregnancy center, you're helping people begin to trust in your pregnancy center, so that if those girls that may have heard your story and didn't quite take it to heart and end up coming to your pregnancy center, or they have friends or family members that come, that trust is already built, and then you've already earned the right to be heard. So people that come into your center that have already heard you, you get the chance to share the Gospel with them, which is the ultimate thing of what we're doing.[14]

At least 29 pregnancy resource centers received a total of over $24 million in Community-Based Abstinence Education (CBAE) funds from 2001 through 2005.[15]

---

[12] The White House, *President's Remarks Via Satellite to the Southern Baptist Convention* (June 15, 2004) (online at http://www.whitehouse.gov/news/releases/2004/06/20040615-9.html).

[13] *Grants Flow to Bush Allies on Social Issues*, Washington Post (Mar. 22, 2006).

[14] Abstinence Liaison, Care Net, *She's Having a Baby: Abstinence and CPCs* (Presentation at the National Abstinence Leadership Conference) (Aug. 8, 2005).

[15] Department of Health and Human Services, *Tracking Accountability in Government Grants System (TAGGS)* (online at http://taggs.hhs.gov). Rebecca E. Fox, *SIECUS State Profiles: A Portrait of Sexuality Education and Abstinence-Only-Until-Marriage Programs in the States, Fiscal Year 2003 Edition* (New York: Sexuality Information and Education Council of the United States, 2004); Rebecca E. Fox, *SIECUS State Profiles: A Portrait of Sexuality Education and Abstinence-Only-Until-Marriage Programs in the States, Fiscal Year 2004 Edition* (New York: Sexuality Information and Education Council of the United States, 2005); Rebecca E. Fox, *SIECUS State Profiles: A Portrait of*

Other pregnancy resource centers have received a total of at least $6 million in abstinence funding provided to the states under section 510 of Title V.[16] The actual total may be higher because centralized information on these grants is not available. For many pregnancy resource centers receiving federal abstinence funding, the grants represented a major increase in their annual budget, in some cases expanding their budgets by seven-fold.[17]

In other cases, pregnancy resource centers have received funding through specific congressional earmarks, including for "counseling and pregnancy support services."[18]

Pregnancy resource centers have also received approximately $1 million through the "Compassion Capital Fund," a component of the Bush Administration's faith-based initiative. Created in 2002 and managed by the Administration for Children and Families at the Department of Health and Human Services, the Compassion Capital Fund was designed to bolster faith- and community-based organizations by providing technical assistance and "capacity building" grants. These grants allow recipients to "increase their effectiveness, enhance their ability to provide social services to serve those most in need, expand their organizations, diversify their funding sources, and create collaborations."[19]

> **For many pregnancy resource centers receiving federal abstinence funding, the grants represented a major increase in their annual budget, in some cases expanding their budgets by seven-fold.**

The Compassion Capital Fund, which has received $150 million in federal funds, provides two types of financial support. "Demonstration grants" are given to intermediary organizations that provide technical assistance and subgrants to smaller faith-based and community groups.[20] The fund also makes "mini grants," one-time capacity-building awards of up to $50,000 for faith-based and community organizations "to increase their capacity to serve targeted social service priority areas."[21]

---

*Sexuality Education and Abstinence-Only-Until-Marriage Programs in the States, Fiscal Year 2005 Edition* (New York: Sexuality Information and Education Council of the United States, 2006).

[16] See SIECUS, *State Profiles 2004* (online at www.siecus.org/policy/states/index.html).

[17] *Grants Flow to Bush Allies on Social Issues*, Washington Post (Mar. 22, 2006).

[18] For example, in fiscal year 2005 appropriations, $150,000 was earmarked for Real Alternatives of Harrisburg, Pennsylvania, for "counseling and pregnancy support services; and $80,000 was earmarked for the Pregnancy Crisis Center in Wichita, Kansas, for "facilities and equipment." P.L. 108-447, *The Fiscal Year 2005 Consolidated Appropriations Act*. Overall, Congress has earmarked over $1.3 million for pregnancy resource centers since 2001.

[19] Administration for Children and Families, Department of Health and Human Services, *About the Compassion Capital Fund* (online at www.acf.hhs.gov/programs/ccf/about_ccf/index.html).

[20] Between 2002 and 2005, the Compassion Capital Fund made demonstration grants totaling more than $125 million to 65 separate intermediary organizations. *See* Administration for Children and Families, *Compassion Capital Fund Intermediary Organization Grantees* (online at www.acf.hhs.gov/programs/ccf/existing_grantees/io_grantees.html).

[21] Between 2003 and 2005, the Compassion Capital Fund made mini-grants totaling more than $22.5 million to 463 organizations. Administration for Children and Families, *Mini-Grants: Targeted*

To date, 25 pregnancy resource centers in 15 states have received grants through the Compassion Capital Fund.  Twenty-two of these centers received an estimated total of $650,000 in subgrants from the Institute for Youth Development (IYD), an intermediary organization which focuses its subgrants on helping smaller organizations "build capacity to identify federal grant opportunities and to prepare highly competitive applications for federal assistance."[22]  Most of the IYD's subgrants to pregnancy resource centers have gone to recipients that are in the process of pursuing a "medical model" of service delivery, including those intending to pursue Medicaid reimbursement for their services.[23]

Of the pregnancy resource centers that have received IYD subgrants, three applied for and received direct mini-grants from the Compassion Capital Fund.  Three additional centers received mini-grants only.[24]  These six mini-grants totaled $293,000.[25]

Two centers that received grants through the Compassion Capital Fund also received federal abstinence-only education funding worth $1.9 million.[26]

---

*Capacity-Building Program*, (online at www.acf.hhs.gov/programs/ccf/about_ccf/prgm_target_cap.html).

[22] Institute for Youth Development, *Description of Compassion Capital Fund Initiative* (online at www.youthdevelopment.org/articles/pr120203.htm).  Data on total subgrant amounts are approximate.  Fifteen centers received about $425,000 in subgrants in 2003 and 2004,according to data provided  by HHS.  Seven more centers received subgrants in 2005, but data on the amounts of those grants was not available.  In addition, two organizations received $50,000 subgrants through IYD's "Pregnancy Resource Center Service Delivery and Medical Model" program.  One of the organizations, Heartbeat International, is an umbrella organization that supports pregnancy resource centers. Institute for Youth Development, IYD Sub-Awards (online at http://www.youthdevelopment.org/articles/subawards.htm).

[23] The IYD provided funds to 15 pregnancy resource centers under its "Pregnancy Resource Center Service Delivery and Medical Model."  Under this program, the center must be engaged in at least one of the following: establishing or expanding a medical model demonstration program to provide an array of prenatal health care services for at-risk or disadvantaged pregnant women; building partnerships and coalitions with other local pregnancy resource centers, existing medical industry entities, and medical service providers to create a cost-effective system to deliver prenatal health care services to at-risk or disadvantaged pregnant women; designing and implementing strategies to recruit medical professionals and staff positions for such a medical model; designing a medical service delivery system that will allow existing pregnancy resource centers to pursue Medicaid reimbursements and other funding activities; demonstrating an exemplary medical practices model to other entities that desire to establish or expand their own models; or assisting other entities to establish or expand their own medical models.  Institute for Youth Development, RFP/IYD 05-302, *Pregnancy Resource Center Service Delivery and Medical Model Program* (Announcement Date Jan. 1, 2005).

[24] Administration for Children and Families, *2003-2005 Funding for Targeted Capacity-Building Program Grantees, a.k.a. Mini-Grantees* (online at www.acf.hhs.gov/programs/ccf/about_ccf/ccf_pdf/2005fundingmg.pdf).

[25] *Id.*

[26] Department of Health and Human Services, *Tracking Accountability in Government Grants System (TAGGS)* (online at http://taggs.hhs.gov).

## II.   PURPOSE AND METHODOLOGY

In December 2004, Rep. Waxman released a report by the Special Investigations Division that evaluated the scientific accuracy of the curricula used in federally funded abstinence-only education programs.  The report found that nearly all of the curricula contained false, misleading, or distorted information about reproductive health.  The curricula included inaccurate information about disease and pregnancy prevention; erroneous effectiveness rates for condoms; the presentation of religious belief as fact; and the teaching of stereotypes about boys and girls as science.[27]

In this report, Rep. Waxman asked the Special Investigations Division to undertake a similar evaluation of federally funded pregnancy resource centers.  Rep. Waxman requested that the investigation examine the medical accuracy of the information that these centers provide to pregnant teenagers seeking advice about whether to have an abortion.  Rep. Waxman did not ask the Special Investigations Division to assess the merits of using federal funds to support organizations that provide pro-life counseling to pregnant teenagers and women, and this report does not address this issue.

In response to Rep. Waxman's request, the Special Investigation Division identified the 25 pregnancy resource centers that have received grants through the Compassion Capital Fund.  For this report, female investigators telephoned the 25 pregnancy resource centers that have received grants from the Compassion Capital Fund, posing as a 17-year-old trying to decide whether to have an abortion, and requesting information and advice.  The caller stated that she was pregnant and thought she wanted an abortion.  If asked for more information, the caller told center staff that:

- she was 17;
- she had taken a home pregnancy test and it was positive;
- she had never been pregnant before;
- her last menstrual period had fallen two months earlier; and
- she wanted to receive as much information as possible on the phone because she didn't think she could come in to the center.[28]

Calls were made to all 25 centers.  A counselor was reached at 23 of the 25.  Attempts made to reach the remaining two were unsuccessful.

Of the 25 centers, 20 maintain public websites.  The Special Investigations Division also reviewed the medical accuracy of the information presented on these websites.

---

[27] U.S. House of Representatives, Committee on Government Reform, Minority Staff, *The Content of Federally-Funded Abstinence-Only Education Programs* (Dec. 2004) (online at www.democrats.reform.house.gov/Documents/20041201102153-50247.pdf).

[28] The majority of CPCs attempted to persuade the caller to visit the center in person.

# III.   FINDINGS

The vast majority of the federally funded pregnancy resource centers contacted during the investigation provided information about the risks of abortion that was false or misleading.  In many cases, this information was grossly inaccurate or distorted.  A pregnant teenager who relied on the information from these federally funded centers would make her decision about whether to give birth or terminate her pregnancy based on erroneous facts and misinformation.

In total, 87% of the centers reached (20 of 23 centers) provided false or misleading information to the callers.  The three major areas of misinformation involved (1) the purported relationship between abortion and breast cancer; (2) the purported relationship between abortion and infertility; and (3) the purported relationship between abortion and mental illness.

## A.   Pregnancy Resource Centers Provided False and Misleading Information About Abortion and Breast Cancer

There is a medical consensus that there is no causal relationship between abortion and breast cancer.  This consensus emerged after several well-designed studies, the largest of which was published in the New England Journal of Medicine in 1997, found no indication of increased risk of breast cancer following an induced abortion.[29]  In 2002, the Bush Administration edited a National Cancer Institute website to suggest that there was still an open scientific question about whether having an abortion might lead to breast cancer.[30]  After Rep. Waxman and other members of Congress protested the change, the National Cancer Institute convened a three-day conference of experts on abortion and breast cancer.[31]  Participants reviewed all existing population-based, clinical, and animal data available.  Their conclusion was that "[i]nduced abortion is not

---

[29] Mads Melbye et al., *Induced Abortion and the Risk of Breast Cancer*, 336 New Eng. J. Med. 81, 84 (1997).

[30] As revised by the Bush Administration, the website stated:  "the possible relationship between abortion and breast cancer has been examined in over thirty published studies since 1957.  Some studies have reported statistically significant evidence of an increased risk of breast cancer in women who have had abortions, while others have merely suggested an increased risk.  Other studies have found no increase in risk among women who had an interrupted pregnancy."  National Cancer Inst., *Early Reproductive Events* and Breast Cancer (Nov. 25, 2002) (online at www.cancer.gov/cancer_information/doc.aspx?viewid=8cf78b34-fc6a-4fc7-9a63-6b16590af277).  *Abortion and Breast Cancer*, New York Times (Jan. 6, 2003).

[31] Letter from Rep. Henry A. Waxman et al. to Tommy G. Thompson, Secretary, U.S. Department of Health and Human Services. (Dec. 18, 2002) (online at www.democrats.reform.house.gov/Documents/20040817143143-53989.pdf).

associated with an increase in breast cancer risk." The panel ranked this conclusion as "[w]ell-established."[32]

Despite this medical consensus, eight centers warned the caller that having an abortion would increase her risk of breast cancer. For example, one center told the caller that "all abortion causes an increased risk of breast cancer in later years."[33] Another center said that research shows a "far greater risk" of breast cancer after an abortion.[34]

A few centers provided a misleading explanation for the purported elevated risk. One told the caller that women who have abortions "are now finding out that they have breast cancer" because the development of hormones and glands in the breast tissue is abruptly stopped.[35] Another center said that there is an increased risk of breast cancer because breast tissue is still developing when an abortion takes place.[36] A third stated that terminating a pregnancy can "affect the milk forming in your breasts" and "some women are finding out that they're having breast cancer later on."[37]

**Despite medical consensus that there is no causal link between abortion and breast cancer, eight centers warned of such a link. One center claimed that the risk would be "extremely high," increasing by as much as 80%.**

Several centers quantified the claimed risk. One center told the caller that there is an "extremely high, increased risk of breast cancer" that "can be as much as an 80% increase depending upon how the risk factors fall into place."[38] A second center stated that abortion increases the risk of breast cancer by 50%.[39] A third center asserted that an abortion elevates the average lifetime risk of breast cancer by 50% and that more abortions increase the risk even more.[40]

The theme of abortion causing breast cancer is reflected in many of the centers' websites. One website reports an "[i]ncreased risk of breast cancer, particularly risky for those who abort their first pregnancy."[41] It further states that "[w]hile study results vary, most demonstrate a 50% or greater increased risk."[42] Another center website states: "For women aborting a first pregnancy, the risk of breast cancer almost doubles after a first-

---

[32] National Cancer Inst., *Summary Report: Early Reproductive Events and Breast Cancer* (Mar. 4, 2003) (online at www.cancer.gov/cancerinfo/ere-workshop-report).
[33] Center T.
[34] Center N.
[35] Center K.
[36] Center S.
[37] Center X.
[38] Center O.
[39] Center U.
[40] Center W.
[41] CareNet Pregnancy Center of Albuquerque, *Abortion* (online at www.carenetabq.org/abortion.shtml) (accessed June 9, 2006).
[42] *Id.*

trimester abortion and is multiplied with two or more abortions. This risk is especially great for women who do not have children. Some recent studies have refuted this finding, but the majority of studies support a connection."[43]

## B.    Pregnancy Resource Centers Provided False and Misleading Information About the Effect of Abortion on Future Fertility

Vacuum aspiration, the method most commonly used for abortions during the first trimester, does not pose an increased risk of infertility or other fertility problems. According to one authority:

> Researchers have reviewed the world literature, including studies from 21 countries, and have concluded that women who have their first pregnancy terminated by vacuum aspiration are at no increased risk of subsequent infertility or ectopic pregnancy when compared with women who carry their first pregnancy to term. They also concluded that a single induced abortion performed by vacuum aspiration does not increase the risk of complications during future pregnancies, the risk of having a low birthweight baby, or the risk of having a pregnancy result in a miscarriage, stillbirth, infant death or congenital malformations.[44]

During the investigation, the caller informed the pregnancy resource center that her last period had been approximately two months earlier and that this was a first pregnancy. These facts placed the caller in the category with no increased risk of infertility from vacuum aspiration. Nonetheless, seven pregnancy resource centers informed the caller that she would be at increased risk of fertility problems from abortion.

Several centers described the risk of abortion-induced infertility as common or high. One told the caller that damage from abortion could lead to "many miscarriages" or to "permanent damage" so "you wouldn't be able to carry." [45] This center stated that this is "common" and happens "a lot."[46]

---

[43] Westside Pregnancy Resource Center, *Physical Health Risks of Abortion* (online at www.wprc.org/21.45.0.0.1.0.phtml) (accessed June 9, 2006).

[44] Atrash and Hogue, *The Effect of Pregnancy Termination on Future Reproduction*, Baillière's Clinical Obstetrics and Gynecology 391-405 (June 1990). A leading obstetrics textbook states that other than the "small risk" of infection, "Fertility is not altered by an elective abortion." F. Gary Cunningham et al., *Williams Obstetrics 21st Edition*, 877 (2001).

[45] Center E.

[46] *Id.*

**One center told the caller that abortion "could destroy your chances of ever having children again" and that infertility "happens more often than the media reports."**

Another center said, "In the future you could have trouble conceiving another baby" [47] because of scar tissue. When the caller asked if that happens to a lot of women, the center said, "A lot of women, yeah."[48] Another told the caller that if she did not need to have an abortion, she should not have one because "the risks of abortion are so great," involving damage to the cervix which could prevent pregnancy.[49] A fourth center told the caller that abortion "could destroy your chances of ever having children again" and that infertility "happens more often than the media reports."[50]

Other centers provided similarly misleading information:

- One center said that there are "possibilities of miscarriage later on in life when you're wanting to get pregnant."[51] When the caller asked if that happens a lot, the center responded, "I don't know what the full statistics are" but "it's just one of the possible risks."[52]

- Another center could not say "exactly how likely it is," but "a lot of the women we see here who've had abortions in the past" are not able to get pregnant.[53]

- Another center said that if the cervix is damaged, "it won't stay closed in future pregnancies, and it can open prematurely and you can have miscarriages." [54] The center told the caller that these physical risks may not happen as often as the emotional risks of abortion, but "it is a very real possibility."[55]

Several of the centers' websites contained the same type of misinformation. For example, one states that abortion brings an "[i]ncreased risk of infertility," claiming that 2% to 5% of abortions result in sterility."[56] Another notes: "Infertility and sterility mean that a woman cannot get pregnant. Abortion causes sterility in 2-5% of the women who have an abortion."[57]

---

[47] Center W.
[48] *Id.*
[49] Center G.
[50] Center H.
[51] Center I.
[52] *Id.*
[53] Center L.
[54] Center B.
[55] *Id.*
[56] CareNet Pregnancy Center of Albuquerque, *Abortion* (online at www.carenetabq.org/abortion.shtml) (accessed June 9, 2006).
[57] Pregnancy Resources, Inc., *Abortion Risks* (online at www.pregnancyresourcesinc.com/abortion_risks.htm) (accessed June 9, 2006).

## C.    Pregnancy Resource Centers Provided False and Misleading Information About the Mental Health Effects of Abortion

Pro-life advocates assert the existence of a condition called "Post-Abortion Syndrome," characterized as severe long-term emotional harm caused by abortion, and claim that this condition occurs frequently. Neither the American Psychological Association nor the American Psychiatric Association recognizes this syndrome, however. In fact, there is considerable scientific consensus that having an abortion rarely causes significant psychological harm. An expert panel of the American Psychological Association convened to "review the best scientific studies of abortion outcome" found:

> The best studies available on psychological responses to unwanted pregnancy terminated by abortion in the United States suggest that severe negative reactions are rare, and they parallel those following other normal life stresses. Despite methodological shortcomings of individual studies, the fact that studies using diverse samples, different measures of postabortion response, and different times of assessment come to very similar conclusions is persuasive evidence that abortion is usually psychologically benign.[58]

Other studies have reached similar results. A subsequent analysis based on a longitudinal study of women one hour before, one hour after, one month after, and two years after abortion found: "Reports support prior conclusions that severe psychological distress after an abortion is rare."[59] A study based on data from the National Longitudinal Survey of Youth, with respondents initially aged 14 to 21, found: "Although women may experience some distress immediately after having an abortion, the experience has no independent effect on their psychological well-being over time."[60] Similarly, a review of multiple studies of teens and abortion reported: "data do not suggest that legal minors are at heightened risk of serious adverse psychological responses compared with adult abortion patients or with peers who have not undergone abortion."[61] Yet another longitudinal study followed 13,000 women in Britain over a period of 11 years and found that women who continued the pregnancy and gave birth experienced the same rate of need for psychological treatment as women who had abortions.[62]

---

[58] N.E. Adler et al., *Psychological Factors in Abortion: A Review*, American Psychologist, 1194–1204, 1202 (Oct. 1992).

[59] B. Major et al, *Psychological Responses of Women After First-Trimester Abortion*, Archives of General Psychiatry, vol. 57, no. 8 (Aug. 2000).

[60] S. Edwards, *Abortion Study Finds No Long-Term Ill Effects on Emotional Well-Being*, Family Planning Perspectives, 193–94 (July–Aug. 1997). The study used data from the National Longitudinal Survey of Youth, with respondents aged 14 to 21 at the start of research. Data was from 1979 through 1987.

[61] N. Adler et al., *Abortion Among Adolescents*, American Psychologist (March 2003).

[62] Anne C. Gilchrist *et al.*, *Termination of Pregnancy and Psychiatric Morbidity*, British Journal of Psychiatry (1995) 243-48. Pro-life advocates point to certain studies that support correlations between a history of abortion and a range of psychological problems. These studies have been criticized for methodological shortcomings, such as the failure to control for factors such as mental

Despite the scientific evidence that abortion does not cause significant long-term psychological harm, thirteen pregnancy resource centers told callers the exact opposite, asserting that having an abortion would cause a wide range of damaging and long-lasting psychological impacts.

According to one center, "the rate of suicide in the year following an abortion goes up by seven times."[63] Other centers described lengthy lists of emotional harm that could result from an abortion:

**One center compared the effects of having an abortion to the experience of soldiers returning from Vietnam, and said that post-abortion stress "is something that anyone who's had an abortion is sure to suffer from."**

- One center said that abortion can bring "huge" emotional complications. The center said that emotions experienced by women following an abortion can be: "guilt, numbness, dreams and nightmares, changes in relationships, … difficulty with making friends, sexual problems, preoccupation with abortion date or due date, … sadness, anxiety, suicidal ideas, sedatives, alcohol, drug use, eating disorders, sense of loss, inability to relax, fear of failure, crying spells, regret, anger, helplessness, headaches, loneliness, panic, … signs of marital stress.[64]

- Another warned of "sadness, long-term grief, anger, sexual dysfunction, guilt, flashbacks, memory repression, anniversary reaction, suicidal thoughts, increased use of alcohol or drugs, or difficulty maintaining close relationships."[65]

- A third center described flashbacks and a "downward spiral where they lose friends and family members."[66]

Another center told the caller that "the side effects of abortion are pretty awful," including guilt or shame, depression, isolation, anxiety, anger, sadness, preoccupation with getting pregnant again, eating disorders, drugs or alcohol abuse, difficulty with intimate relationships, and suicidal thoughts, and "there is more after that."[67] This center said that after an abortion, 80% of women seek psychiatric help "in relation to their

---

illness or childhood abuse that may explain both the unintended pregnancy and the mental health problem. Guttmacher Institute, *Abortion in Women's Lives* (2006) at 24; Patricia Dietz et al., *Unintended Pregnancy Among Adult Women Exposed to Abuse of Household Dysfunction During Their Childhood*, Journal of the American Medical Association (Oct. 13, 1999).

[63] Center Q.

[64] Center P.

[65] Center M.

[66] Center S. Other centers referred to "depression, anxiety, a whole bunch of different emotional risks" that can follow from abortion (Center K); "usually some nervousness, trouble sleeping, insomnia, or nightmares, sometimes it can lead then into maybe eating disorders or other psychological effects" (Center N); and depression and guilt "that may be at the root cause of other problems" such as eating disorders and suicidal tendencies (Center B).

[67] Center O.

abortion," often years later.[68]  In contrast, the center asserted that only 3% of women who have full-term pregnancies seek psychiatric care for short-lived post-partum depression, explaining:

> Having a baby is a normal process and what it does is fulfills a woman.  It is fulfilling one of the roles that she has.  Abortion is the exact opposite; she is doing something totally contrary to what her role is.  That's why it has such an emotional impact on women.[69]

One center compared the experience of having an abortion to the experience of going to war, analogizing the post-traumatic stress experienced after an abortion to that seen in soldiers after Vietnam, and said that it "is something that anyone who's had an abortion is sure to suffer from."[70]

The pregnancy resource centers indicated that these emotional effects are extremely common, telling the caller:  over 75% of women experience mild to severe post-abortion stress syndrome[71]; "[j]ust about over 90% of women have some type of emotional or psychological effects of abortion"[72]; post-abortion syndrome and other problems happen to everyone "in varying degrees"[73]; and the "majority" of women who choose abortion have post abortion syndrome in "various degrees."[74]  The center that asserted that suicide rates increase seven times following an abortion also said that "60-70% of women have emotional complications from an abortion."[75]

The idea that abortion is likely to lead to long-term psychological harm was also present on many of the centers' websites.  For example, the following descriptions appeared on these websites:

- **"What is Post Abortion Syndrome?**  Nine out of every ten women who have undergone an abortion suffer deep seated anxiety and regret called post-abortion syndrome.  Sometimes it appears many years later."[76]

- **"Psychological/Emotional Trauma:**  50% of post-abortive women report experiencing emotional and psychological disturbances lasting for months or years.  This includes acute feeling of grief, depression, anger, fear of disclosure, preoccupation with babies or getting pregnant again, nightmares, sexual

---

[68] *Id.*

[69] *Id.*

[70] Center R.

[71] Center V.

[72] Center X.

[73] Center U.

[74] Center J.

[75] Center Q.

[76] Women's Care Center *Facts You Should Know About Abortion* (online at www.womenscarecenter.org/faq_abortion.html) (accessed June 9, 2006).

dysfunction, termination of relationships, emotional coldness, increased alcohol and drug abuse, eating disorders, anxiety, flashbacks, anniversary syndrome, repeat abortions, and suicide."[77]

# CONCLUSION

Pregnant teenagers and women turn to federally funded pregnancy resource centers for advice and counseling at a difficult time in their lives.  These centers, however, frequently fail to provide medically accurate information.  The vast majority of pregnancy centers contacted in this investigation misrepresented the medical consequences of abortion, often grossly exaggerating the risks.  This tactic may be effective in frightening pregnant teenagers and women and discouraging abortion.  But it denies the teenagers and women vital health information, prevents them from making an informed decision, and is not an accepted public health practice.

---

[77] A Woman's Concern Pregnancy Resource Clinic, *Considering Abortion?* (online at www.awomansconcern.com/considering_abortion.htm) (accessed June 9, 2006).

**EXHIBIT B**

1 of 3 DOCUMENTS

The Washington Post

July 18, 2006 Tuesday
Final Edition

# Pregnancy Centers Found to Give False Information on Abortion

**BYLINE:** Marc Kaufman, Washington Post Staff Writer

**SECTION:** A Section; A08

**LENGTH:** 579 words

Federally funded "pregnancy resource centers" are incorrectly telling women that abortion results in an increased risk of breast cancer, infertility and deep psychological trauma, a minority congressional report charged yesterday.

The report said that 20 of 23 federally funded centers contacted by staff investigators requesting information about an unintended pregnancy were told false or misleading information about the potential risks of an abortion.

The pregnancy resource centers, which are often affiliated with antiabortion religious groups, have received about $30 million in federal money since 2001, according to the report, requested by Rep. Henry A. Waxman (D-Calif.). The report concluded that the exaggerations "may be effective in frightening pregnant teenagers and women and discouraging abortion. But it denies the teenagers and women vital health information, prevents them from making an informed decision, and is not an accepted public health practice."

A spokeswoman for one of the two large networks of pregnancy resource centers, Sterling-based Care Net, said that the report is "a routine attack on us that's nothing new."

Care Net's Molly Ford said the centers criticized by Waxman received federal grants for abstinence-only programs they conduct, but not for pregnancy counseling. "The funds are kept entirely separate," she said.

Ford said, however, that she agrees with pregnancy counselors who tell women that abortion may increase the risk of breast cancer, infertility and a condition described by antiabortion groups as "post-abortion syndrome."

"We have many studies that show significant medical problems associated with abortion," she said.

Those studies are at odds with mainstream medical opinion. An expert panel of the National Cancer Institute (NCI), for instance, concluded in 2003 that an "abortion is not associated with an increase in breast cancer." The experts said their conclusion was "well established" by the evidence.

The report, from the Democratic staff of the House Government Reform Committee, found that counselors at eight of the centers told callers that abortion substantially increases the risk of breast cancer. Some counselors also said the psychological effects of abortion are severe and long-lasting, while research generally has found that severe stress reactions are no more common after an abortion than after giving birth.

President Bush has been an advocate for pregnancy resource centers and for abstinence-only sex education. Few of the pregnancy resource centers -- formerly called crisis pregnancy centers -- received any federal funding before 2001. Care Net's Ford said there are now about 2,000 centers in the United States and Canada.

Waxman has been a critic of many Bush administration women's health programs, including a 2002 reference on an NCI Web site suggesting that there was serious debate about whether abortion increases the risk of breast cancer. As a result, the NCI brought together experts to review existing data and came up with its conclusion that no abortion-breast cancer association exists. The statement was later deleted from the NCI Web site.

Last year, Waxman initiated a study of a government Web site intended to help parents and teenagers make "smart choices" about sexual activity. A team of medical experts who reviewed the Web site said it included inaccurate or misleading information that could alienate some families or prompt riskier behavior.

**LOAD-DATE:** July 18, 2006

**LANGUAGE:** ENGLISH

**PUBLICATION-TYPE:** Newspaper

Copyright 2006 The Washington Post

**EXHIBIT C**



THE WHITE HOUSE
PRESIDENT
GEORGE W. BUSH



For Immediate Release
Office of the Press Secretary
June 5, 2002

## The Compassion Capital Fund and the Faith- and Community-Based Initiative

Overview: The Compassion Capital Fund (CCF) is a $30 million fund that Congress appropriated to the Department of Health and Human Services in January 2002. The CCF represents the first appropriated federal funds that are specifically targeted to assist the grassroots organizations that are the focus of President Bush's faith-based and community initiative.

The CCF will be used to expand the role that faith-based and community groups play in providing social services to those in need. The CCF reflects the administration's recognition that faith-based and community organizations are uniquely situated to partner with the government in serving poor and low-come individuals and families, particularly those with the greatest needs such as families in poverty, prisoners reentering the community and their families, children of prisoners, homeless families, and at-risk youth.

Information on the availability of CCF grants will be published in the June 7, 2002, Federal Register, and grant awards will be made this fall. More information about the President's initiative and the HHS Center for Faith-Based and Community Initiatives is available at http://www.hhs.gov/faith/.

## ACTIVITIES SUPPORTED BY THE CCF

The CCF will be used to support four activities:

### Technical Assistance to Intermediary Organizations

- Nearly $25 million will be awarded to 15-25 "intermediary organizations," which will in turn help smaller organizations operate and manage their programs effectively, access funding from varied sources, develop and train staff, expand the types and reach of social services programs in their communities, and replicate promising programs.

- In addition to providing technical assistance, these intermediary groups will issue sub-awards directly to qualified faith- and community-based organizations to expand or replicate promising or best practices in targeted areas. Priority for sub-awards will be given to organizations that focus on homelessness, hunger, at-risk children, transition from welfare to work, and those in need of intensive rehabilitation such as addicts or prisoners.

- To encourage organizations to work in partnership with the federal government, intermediary organizations will be expected to provide at least 50 percent of the amount of federal funds requested (i.e., one-third of the proposed total budget).

- CCF funds may not be used to support religious practices such as religious instruction, worship or prayer.

- Intermediary organizations will be selected to receive funding based on a competitive review process. HHS is seeking applications from a diverse range of organizations able to assist a diverse group of faith-based and community organizations that represent different organizational or religious affiliations. Awards will be announced before the end of September 2002.

### Compassion Capital National Resource Center

- Approximately $2 million will be used to establish the CCF National Resource Center.

- The National Resource Center will work directly with the intermediary organizations to ensure that faith- and community-based organizations receive effective and appropriate technical assistance, and it will develop a comprehensive plan to oversee and coordinate the work of intermediary organizations that receive federal funding.

- The National Resource Center will also develop tools that will be useful and accessible to all interested faith-based and community groups, regardless of whether they are working with a funded intermediary. For example, the National Resource Center will develop and maintain a Web site that addresses a wide array of topics useful to faith-based and community organizations, such as "best practices" to meet the needs of individuals and families, and evaluation and assessment of program outcomes and effectiveness. It will also develop manuals on specific topics that will assist faith-based and community organizations.

**Research Regarding Best Practices and Services of Intermediary Organizations**

- Approximately $1.6 million will be used to support research on the services and best practices of intermediary organizations and the faith-based and community organizations they serve.

**Field-Initiated Research Grants**

- Approximately $1 million will be awarded to five to eight organizations to support short-term research projects that will contribute to the knowledge base regarding roles and promising approaches by diverse types of faith- and community-based organizations that focus on homelessness, hunger, at-risk children, the transition from welfare to work, and intensive services for those most in need such as addicts and prisoners.

### ###

Note: All HHS press releases, fact sheets and other press materials are available at **www.hhs.gov/news**.

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2002/06/20020605-9.html

🖨 CLICK HERE TO PRINT



## OMB's Mission

OMB's predominant mission is to assist the President in overseeing the preparation of the federal budget and to supervise its administration in Executive Branch agencies. In helping to formulate the President's spending plans, OMB evaluates the effectiveness of agency programs, policies, and procedures, assesses competing funding demands among agencies, and sets funding priorities. OMB ensures that agency reports, rules, testimony, and proposed legislation are consistent with the President's Budget and with Administration policies.

In addition, OMB oversees and coordinates the Administration's procurement, financial management, information, and regulatory policies. In each of these areas, OMB's role is to help improve administrative management, to develop better performance measures and coordinating mechanisms, and to reduce any unnecessary burdens on the public.

**EXHIBIT D**

# CREW | citizens for responsibility and ethics in washington

August 4, 2006

FOIA Officer
Office of Management and Budget
725 17th Street, N.W.
Room 9026
Washington, D.C. 20503

**Re: Freedom of Information Act Request**

Dear Sir/Madam:

Citizens for Responsibility and Ethics in Washington ("CREW") makes this request for records, regardless of format, medium, or physical characteristics, and including electronic records and information, audiotapes, videotapes and photographs, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. §552, et seq.

Specifically, CREW seeks any and all documents and records from any office within the Office of Management and Budget, its agencies, offices, and its components, described in the following categories:

1.  All documents and records discussing in any way the July 2006 report, "False and Misleading Health Information Provided by Federally Funded Pregnancy Resource Centers," prepared for Rep. Henry A. Waxman by the U.S. House of Representatives Committee on Government Reform.

2.  All documents and records provided to staff of the House of Representatives who prepared the July 2006 report, "False and Misleading Health Information Provided by Federally Funded Pregnancy Resource Centers."

3.  All documents and records addressing any actions proposed or taken in response to the July 2006 report, "False and Misleading Health Information Provided by Federally Funded Pregnancy Centers."

4.  All documents and records of any communications with any other federal, state, or local governmental agencies regarding pregnancy resource centers (or crisis pregnancy centers) requesting or receiving grants through the Compassion Capital Fund.

5.      All documents and records of any communications with the White House regarding pregnancy resource centers (or crisis pregnancy centers) requesting or receiving grants through the Compassion Capital Fund.

6.      All documents and records of any communications with the White House Office of Faith Based and Community Initiatives regarding pregnancy resource centers.

7.      All documents and records of any communications with the U.S. Department of Justice regarding federal funding of pregnancy resource centers (or crisis pregnancy centers).

8.      All documents and records of any communications with the Department of Health and Human Services regarding federal funding of pregnancy resource centers (or crisis pregnancy centers).

9.      All documents and records of any communications with, between, or among the Executive Office of the President, the Executive Branch, and/or Congress.

10.     All documents and records of any communications with the General Accounting Office regarding federal funding of pregnancy resource centers (or crisis pregnancy centers).

11.     All documents and records of any communication regarding the amount of federal funding available, recommended, or considered for pregnancy resource centers (or crisis pregnancy centers).

12.     All documents and records of any communication regarding to what entity or location federal funds might be dispersed for pregnancy resource centers (or crisis pregnancy centers), including any breakdown of funds dispersed.

13.     All documents and records identifying eligibility requirements, prerequisites, or standards for pregnancy resource centers (or crisis pregnancy centers) to receive federal funds.

14.     All documents and records of any communications addressing the accuracy of information provided by federally funded pregnancy resource centers (or crisis pregnancy centers).

15.     All documents and records of any communications addressing or monitoring in any way a segregation of federal funds provided to pregnancy resource centers (or crisis pregnancy centers) from use in any religious activities sponsored by the same grant recipients.

16.     All documents and records of any budget analysis or management review requested of or performed by the Office of Management and Budget.

2

17.     All documents and records of any evaluation or analysis of the effectiveness of the work
or programs funded by the Compassion Capital Fund.

Please search responsive records regardless of format, medium, or physical
characteristics. We seek records of any kind, including electronic records, audiotapes,
videotapes, and photographs. Our request includes any telephone messages, voice mail
messages, daily agenda and calendars, information about scheduled meetings and/or discussions,
whether in-person or over the telephone, agendas for those meetings and/or discussions,
participants included in those meetings and/or discussions, minutes of any such meetings and/or
discussions, the topics discussed at those meetings and/or discussions, e-mail regarding meetings
and/or discussions, e-mail or facsimiles sent as a result of those meetings and/or discussions, and
transcripts or notes of any such meetings and/or discussions.

If it is your position that any portion of the requested records is exempt from disclosure,
CREW requests that you provide it with an index of those documents as required under Vaughn
v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1972). As you are aware, a
Vaughn index must describe each document claimed as exempt with sufficient specificity "to
permit a reasoned judgment as to whether the material is actually exempt under FOIA."
Founding Church of Scientology v. Bell, 603 F.2d 945, 949 (D.C. Cir. 1979). Moreover, the
Vaughn index must "describe each document or portion thereof withheld, and for **each**
withholding it must discuss the consequences of supplying the sought-after information." King
v. U.S. Dep't of Justice, 830 F.2d 210, 223-24 (D.C. Cir. 1987) (emphasis added). Further, "the
withholding agency must supply 'a relatively detailed justification, specifically identifying the
reasons why a particular exemption is relevant and correlating those claims with the particular
part of a withheld document to which they apply.'" Id. at 224 (citing Mead Data Central v. U.S.
Dep't of the Air Force, 566 F.2d 242, 251 (D.C. Cir. 1977).

In the event that some portions of the requested records are properly exempt from
disclosure, please disclose any reasonably segregable non-exempt portions of the requested
records. See 5 U.S.C. §552(b). If it is your position that a document contains non-exempt
segments, but that those non-exempt segments are so dispersed throughout the document as to
make segregation impossible, please state what portion of the document is non-exempt, and how
the material is dispersed throughout the document. Mead Data Central, 566 F.2d at 261. Claims
of nonsegregability must be made with the same degree of detail as required for claims of
exemptions in a Vaughn index. If a request is denied in whole, please state specifically that it is
not reasonable to segregate portions of the record for release.

**Fee Waiver Request**

In accordance with 5 U.S.C. §552(a)(4)(A)(iii), CREW requests a waiver of fees
associated with processing this request for records. The subject of this request concerns the
operations of the federal government and the disclosures will likely contribute to a better
understanding of relevant government procedures by CREW and the general public in a

3

significant way. Moreover, the request is primarily and fundamentally for non-commercial purposes. 5 U.S.C. §552(a)(4)(A)(iii). See, e.g., McClellan Ecological v. Carlucci, 835 F.2d 1282, 1285 (9th Cir. 1987). Specifically, these records are likely to contribute to the public's understanding of how the government uses taxpayer dollars in its grant-awarding process.

CREW is a non-profit corporation, organized under section 501(c)(3) of the Internal Revenue code. CREW is committed to the protection of the citizen's right to be aware of the activities of government officials and to ensuring the integrity of those officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the government decision-making process. CREW uses a combination of research, litigation, and advocacy to advance its mission. The release of information garnered through this request is not in CREW's financial interest. CREW will analyze the information responsive to this request, and will likely share its analysis with the public, either through memorandums, reports or press releases. In addition, CREW will disseminate any documents it acquires from this request to the public. A review of its website, www.citizensforethics.org, demonstrates that CREW has an established history of acquiring documents through the FOIA and publishing them on its website for public use. For example, CREW's website currently includes documents CREW acquired through a FOIA request of the State Department relating to the response to offers of foreign assistance after hurricane Katrina.

Under these circumstances, CREW fully satisfied the criteria for a fee waiver.

### Conclusion

Please respond to this request in writing within twenty (20) working days as required under 5 U.S.C. §552(a)(6)(A)(I). If all of the requested documents are not available within that time period, CREW requests that you provide it with all requested documents or portions of documents which are available within that time period.

If you have any questions about this request or foresee any problems in releasing fully the requested records within the twenty-day period, please call Sharon Eubanks at (202) 408-5565. Also, if CREW's request for a fee waiver is not granted in full, please contact our office immediately upon making such determination. Please send the requested documents to Sharon Y. Eubanks, Citizens for Responsibility and Ethics in Washington, 1400 Eye Street, N.W., Suite 450, Washington, D.C. 20005.

Sincerely,

*Sharon Y. Eubanks*

SHARON Y. EUBANKS
Senior Counsel

4

**EXHIBIT E**

EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503



September 22, 2006

Ms. Sharon Y. Eubanks
Senior Counsel
Citizens for Responsibility
 And Ethics in Washington
1400 Eye Street N.W.
Suite 450
Washington, D.C. 20005

Dear Mr. Eubanks:

This responds to your Freedom of Information Act (FOIA) request to the Office of Management and Budget (OMB) dated August 4, 2006, which was received in this office on August 30, 2006. Your request asked for:

1. All documents and records discussing in any way the July 2006 report, "False and Misleading Health Information Provided by Federally Funded Pregnancy Resource Centers," prepared for Rep. Henry A Waxman by the U.S. House of Representatives Committee on Government Reform.

2. All documents and records provided to staff of the House of Representatives who prepared the July 2006 report, "False and Misleading Health Information Provided by Federally Funded Pregnancy Resource Centers."

3. All documents and records addressing any actions proposed or taken in response to the July 2006 report, "False and Misleading Health Information Provided by Federally Funded Pregnancy Centers."

4. All documents and records of any communications with any other federal, state, or local governmental agencies regarding pregnancy resource centers (or crisis pregnancy centers) requesting or receiving grants through the Compassion Capital Fund.

5. All documents and records of any communications with the White House regarding pregnancy resource centers (or crisis pregnancy centers) requesting or receiving grants through the Compassion Capital Fund.

6. All documents and records of any communications with the White House Office of Faith Based and Community Initiatives regarding pregnancy resource centers.

7. All documents and records of any communications with the U.S. Department of Justice regarding federal funding of pregnancy resource centers (or crisis pregnancy centers).

8.  All documents and records of any communications with the Department of Health and Human Services regarding federal funding of pregnancy resource centers (or crisis pregnancy centers).

9.  All documents and records of any communications with, between, or among the Executive Office of the President, the Executive Branch, and/or Congress.

10. All documents and records of any communications with the General Accounting Office regarding federal funding of pregnancy resource centers (or crisis pregnancy centers).

11. All documents and records of any communication regarding the amount of federal funding available, recommended, or considered for pregnancy resource centers (or crisis pregnancy centers).

12. All documents and records of any communication regarding to what entity or location federal funds might be dispersed for pregnancy resource centers (or crisis pregnancy centers), including any breakdown of funds dispersed.

13. All documents and records identifying eligibility requirements, prerequisites, or standards for pregnancy resource centers (or crisis pregnancy centers) to receive federal funds.

14. All documents and records of any communications addressing the accuracy of information provided by federally funded pregnancy resource centers (or crisis pregnancy centers).

15. All documents and records of any communications addressing or monitoring in any way a segregation of federal funds provided to pregnancy resource centers (or crisis pregnancy centers) from use in any religious activities sponsored by the same grant recipients.

16. All documents and records of any budget analysis or management review requested of or performed by the Office of Management and Budget.

After careful review of your request, we have identified four documents that are potentially responsive to your request. It is my decision, however, that these four documents are exempt from mandatory disclosure pursuant to FOIA Exemption, 5 U.S.C. 552(b)(5), because they constitute interagency or intra-agency predecisional deliberative communications, the disclosure of which would inhibit the frank and candid exchange of views that are necessary for effective government decision making. I have concluded that the disclosure of these documents would not be in the public interest and therefore decline to release them.

3

This is my personal decision which may be appealed pursuant to OMB regulations, at 5 C.F.R. 1303.

Sincerely,

*Pamela Pfer for*

Lauren E. Wright
Deputy Assistant Director
  for Administration

**EXHIBIT F**

# CREW | citizens for responsibility and ethics in washington

September 27, 2006

Lauren E. Wright
Deputy Assistant Director
   for Administration
Executive Office of the President
Office of Management and Budget
725 17ᵗʰ Street, N.W.
Room 9026
Washington, D.C. 20503

Re: <u>Freedom of Information Act Appeal</u>

Dear Ms. Wright:

By letter dated September 22, 2006, the Office of Management and Budget (OMB) advised Citizens for Responsibility and Ethics in Washington (CREW) that our request of August 4, 2006, made under the Freedom of Information Act (FOIA), was denied in full. CREW hereby appeals that determination and requests that you reverse it for the reasons set forth below.

Our August 4, 2006 FOIA request sought, in part, all documents and records that discussed the July 2006 report prepared for Rep. Henry A. Waxman regarding federally funded pregnancy resource centers; documents of any communications between OMB and any federal, state, and local government agencies; communications with the White House regarding federally funded pregnancy resource centers; and those documents that discuss the Compassion Capital Fund. For your convenience, a copy of our August 4, 2006 FOIA request is enclosed.

OMB's initial determination claims that OMB has identified **only** four documents that are potentially responsive to CREW's request; and that based on "your personal decision" these documents "are exempt from mandatory disclosure pursuant to FOIA Exemption, 5 U.S.C. 552(b)(5), because they constitute interagency or intra-agency predecisional deliberative communications." As explained more fully below, this determination is wrong as a matter of law and fact.

Exemption 5 protects information about an agency's decision-making process. Advice and recommendations involving a "deliberative process" on legal and policy matters may be withheld, but the segregable, factual portions of documents should be disclosed. 5 U.S.C. § 552(b) (2000).

Here, OMB has neither characterized the nature of any factual portions of the documents that might be segregable, nor has it articulated how the documents CREW requested are a part of OMB's deliberative process leading to any final decision on the issue of federally funded

Lauren E. Wright
September 27, 2006
Page 2

pregnancy resource centers.  It is the agency's burden of establishing what deliberative process is involved, and the role played by the documents at issue in the course of that process.  See Coastal States Gas Corp. V. DOE, 199 U.S. App. D.C. 272, as cited by Vaughn v. Rosen, 523 F.2d 1136, 1146 (1975).

Moreover, having identified just four documents, it is questionable whether OMB performed a search that was "reasonably calculated to uncover all relevant documents" as required under FOIA.  Weisberg v. United States Dep't. Of Justice, 705 F.2d 1344, 1351 (D.C. Cir. 1983).  After performing an abbreviated search of OMB's website ourselves, we discovered several documents that mention the Compassion Capital Fund and the Faith and Community Based Initiative.  Clearly, these documents are responsive to CREW's FOIA request and yet they were not identified or produced in response to the same.

The nature of the documents CREW requested belies the blanket applicability of Exemption 5.  The documents CREW seeks, in large part, are documents which contain a discussion between OMB and any agency including the White House or Members of Congress and their staff of federally funded pregnancy resource centers; the Compassion Capital Fund and the relationship between the Compassion Capital Fund and the Faith Based and Community initiatives.  It is difficult to conceive that all of the documents within OMB's possession of this sort would constitute interagency or intra-agency predecisional deliberative communications.

Accordingly, because OMB has failed to justify its blanket assertion of Exemption 5 for the universe of documents responsive to CREW's FOIA request, its initial determination to withhold all responsive documents must be reversed.

Sincerely,

Kimberly D. Perkins
Counsel
Citizens for Responsibility and Ethics in Washington

Enclosure

# CREW | citizens for responsibility and ethics in washington

1400 Eye Street, N.W.
Suite 450
Washington, D.C. 20005



UNITED STATES POSTAGE
02 1P
0002629848
MAILED FROM ZIP CODE 20005
$ 000.63⁰
PITNEY BOWES
SEP 27 2006

Lauren E. Wright
Deputy Assistant Director for Administration
Executive Office of the President
Office of Management and Budget
725 17th Street, N.W., Room 9026
Washington, D.C. 20503

**EXHIBIT G**



EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

November 9, 2006

[SENT VIA FACSIMILE (202) 588-5020 AND FIRST CLASS U.S. MAIL]

Ms. Kimberly D. Perkins
Counsel
Citizens for Responsibility and Ethics in Washington
1400 Eye Street, N.W.
Suite 450
Washington, DC  20005

Dear Ms. Perkins:

This responds to your appeal letter dated September 27, 2006, which was received on October 11, 2006, concerning the Office of Management and Budget's (OMB's) response of September 22, 2006, to your organization's Freedom of Information Act (FOIA) dated August 4, 2006 which was receive by OMB's FOIA Office on August 30, 2006.

In your FOIA request you asked for:

1.   All documents and records discussing in any way the July 2006 report, "False and Misleading Health Information Provided by Federally Funded Pregnancy Resource Centers," prepared for Rep. Henry A Waxman by the U.S. House of Representatives Committee on Government Reform.

2.   All documents and records provided to staff of the House of Representatives who prepared the July 2006 report, "False and Misleading Health Information Provided by Federally Funded Pregnancy Resource Centers."

3.   All documents and records addressing any actions proposed or taken in response to the July 2006 report, "False and Misleading Health Information Provided by Federally Funded Pregnancy Centers."

4.   All documents and records of any communications with any other federal, state, or local governmental agencies regarding pregnancy resource centers (or crisis pregnancy centers) requesting or receiving grants through the Compassion Capital Fund.

5.   All documents and records of any communications with the White House regarding pregnancy resource centers (or crisis pregnancy centers) requesting or receiving grants through the Compassion Capital Fund.

6. All documents and records of any communications with the White House Office of Faith Based and Community Initiatives regarding pregnancy resource centers.

7. All documents and records of any communications with the U.S. Department of Justice regarding federal funding of pregnancy resource centers (or crisis pregnancy centers).

8. All documents and records of any communications with the Department of Health and Human Services regarding federal funding of pregnancy resource centers (or crisis pregnancy centers).

9. All documents and records of any communications with, between, or among the Executive Office of the President, the Executive Branch, and/or Congress.

10. All documents and records of any communications with the General Accounting Office regarding federal funding of pregnancy resource centers (or crisis pregnancy centers).

11. All documents and records of any communication regarding the amount of federal funding available, recommended, or considered for pregnancy resource centers (or crisis pregnancy centers).

12. All documents and records of any communication regarding to what entity or location federal funds might be dispersed for pregnancy resource centers (or crisis pregnancy centers), including any breakdown of funds dispersed.

13. All documents and records identifying eligibility requirements, prerequisites, or standards for pregnancy resource centers (or crisis pregnancy centers) to receive federal funds.

14. All documents and records of any communications addressing the accuracy of information provided by federally funded pregnancy resource centers (or crisis pregnancy centers).

15. All documents and records of any communications addressing or monitoring in any way a segregation of federal funds provided to pregnancy resource centers (or crisis pregnancy centers) from use in any religious activities sponsored by the same grant recipients.

16. All documents and records of any budget analysis or management review requested of or performed by the Office of Management and Budget.

In our September 22, 2006 response letter, OMB stated that it had conducted a search for documents responsive to your request and had identified four (4) potentially responsive documents which were determined to be exempt from mandatory disclosure and were withheld pursuant to FOIA Exemption 5, 5 U.S.C. § 552(b)(5).

In your appeal letter replying to OMB's response, you asked OMB to reconsider its decision to withhold the 4 documents and also questioned the sufficiency of OMB's search based upon an "abbreviated search" of OMB's website in which you located several documents that mention the Compassion Capital Fund and the Faith and Community Based Initiative. Your appeal letter claims that these documents would be responsive to your FOIA request.

As you are aware, your FOIA request contained 16 numbered items and focused upon documents related to pregnancy resource centers. In response to your appeal, OMB has again re-reviewed your entire request, the four (4) withheld documents, and your assertion about the documents contained on OMB's website. We have reviewed our search for responsive documents and based upon our review, we have determined that –

1.  with regard to items numbered 1 through 8, 10 through 13, and 15 in your FOIA request, there are no responsive documents.

2.  with regard to item number 14, there are four (4) potentially responsive documents which OMB has withheld, as identified above.

3.  items numbered 9 and 16 are extremely overbroad and do not identify documents sufficiently to enable the government to conduct a reasonable search.

After a careful review, I have determined that the four (4) documents have been properly withheld under FOIA Exemption 5 U.S.C. § 552(b)(5). We are continuing to withhold these documents because they constitute intra-agency or inter-agency, pre-decisional, and deliberative communications, the disclosure of which would inhibit the frank and candid exchange of views necessary for effective government decision making. The withheld materials consist of pre-decisional opinions, discussions and/or draft versions of documents which were being considered, commented upon and revised by Executive Branch staff during budgetary review deliberations. We believe that the release of those materials would chill the deliberative process, which would be contrary to the public interest. We therefore reaffirm our decision to withhold these documents and decline to release them.

Additionally, we have confirmed the adequacy of OMB's search during our review of your claim that there are documents located on OMB's website under the heading of the Compassion Capital Fund and the Faith and Community Based Initiative. You may not be aware that the Compassion Capital Fund is a key component of the Faith and Community Based Initiative that provides training, technical assistance, and capacity-building grants to a diverse and broad group of grassroots faith and community based organizations serving the needy. Your FOIA request focused upon pregnancy resource centers (which is one small subset of grantees within the fund). Consequently, your locating documents about this fund on OMB's website would not necessarily have any meaningful correlation to documents responsive to your specific FOIA request.

Judicial review of my action on your appeal is available to you in accordance with the provisions of 5 U.S.C. § 552(a)(4).

Sincerely,

Kimberley Luczynski
Acting Deputy General Counsel

I
07-12
BMU

# CIVIL COVER SHEET

JS-44
(Rev. 2/01 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Citizens for Responsibility and Ethics in Washington  11001 | Office of Management and Budget |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    11001 (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    11001 (IN U.S. PLAINTIFF CASES ONLY) NOTE: In land condemnation cases, use the location of the tract of land involved |

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Kimberly D. Perkins
Anne L. Weismann
Citizens for Responsibility and Ethics in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C. 20005
(202)-408-5565

```
CASE NUMBER  1:07CV00012

JUDGE:  Ricardo M. Urbina

DECK TYPE:  FOIA/Privacy Act

DATE STAMP:  01/04/2007
```

## II BASIS OF JURISDICTION
(SELECT ONE BOX ONLY)

- ○ 1  U.S. Government Plaintiff
- ● 2  U.S. Government Defendant
- ○ 3  Federal Question (U.S. Government Not a Party)
- ○ 4  Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP
(FOR DIVERSITY...)

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Select one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ○ A. Antitrust | ○ B. Personal Injury/ Malpractice | ○ C. Administrative Agency Review | ○ D. Temporary Restraining Order/Preliminary Injunction |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br><br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| ○ E. General Civil (Other)    OR    ○ F. Pro Se General Civil |
|---|

| **Real Property** | **Bankruptcy** | **Forfeiture/Penalty** | **Other Statutes** |
|---|---|---|---|
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced & Corrupt Organizations<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/Exchange<br>☐ 875 Customer Challenge 12 USC 3410 |
| **Personal Property**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | | **Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or defendant)<br>☐ 871 IRS-Third Party 26 USC 7609 | ☐ 900 Appeal of fee determination under equal access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act) ③ |

| ○ G. Habeas Corpus/2255 | ○ H. Employment Discrimination | ○ I. FOIA/PRIVACY ACT | ○ J. Student Loan |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability, age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☒ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. Labor/ERISA (non-employment) | ○ L. Other Civil Rights (non-employment) | ○ M. Contract | ○ N. Three-Judge Court |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

○ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

5 USC sec. 552. The Office of Management and Budget has failed to produce records in response to plaintiff's FOIA request.

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23    DEMAND $ _____ Select YES only if demanded in complaint    JURY DEMAND: ☐ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY** (See instruction)    ☒ YES    ☐ NO    If yes, please complete related case form.

DATE 1/4/07    SIGNATURE OF ATTORNEY OF RECORD _Kwd Rl._

---

INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.